# IN THE COURT OF APPEALS OF IOWA

No. 25-0402
Filed September 4, 2025

**IN THE INTEREST OF A.S.,**
**Minor Child,**

**S. R. and J.R., Intervenors,**
    Appellants,

_____

Appeal from the Iowa District Court for Black Hawk County, Michelle Jungers, Judge.

In a child-in-need-of-assistance action, the intervenor-grandparents challenge the adjudication of the child as in need of assistance; the dispositional order, which ordered the Iowa Department of Health and Human Services to place the child with fictive kin rather than adult relatives; and the juvenile court's denial of their motion for concurrent jurisdiction. **AFFIRMED.**

Melissa A. Nine (argued) of Nine Law Office, Marshalltown, for appellants intervenor-grandparents.

Rachel Antonuccio (argued) of Waterloo Juvenile Public Defender, Waterloo, attorney for appellee minor child.

Brenna Bird, Attorney General, and Michelle R. Becker (argued), Assistant Attorney General, for appellee State.

Christina Shriver of Law Office of Christina Shriver, Waterloo, guardian ad litem for minor child.

Heard at argument by Greer, P.J., and Badding and Chicchelly, JJ.

**GREER, Presiding Judge.**

All parties and the juvenile court agreed this is not your "typical" child-in-need-of-assistance (CINA) proceeding. Seven-year-old A.S. became an orphan after first her father and then her mother died of drug overdoses in a ten-day span. But, before the mother died, the Iowa Department of Health and Human Services (HHS) stepped in, met with the mother and child, and initiated a child protective assessment. Once HHS learned of the mother's death, it was initially expected that the maternal grandparents[1] would assume A.S.'s care without further State involvement. But due to poor communication between HHS; the fictive kin[2] with whom A.S. was staying at the time of the mother's death, and the maternal grandmother; HHS became further involved—filing both a removal application and CINA petition. Since then, the child has remained in the care of the fictive kin and the juvenile court proceedings have turned into a custody battle.

At the dispositional hearing, HHS, the child's guardian ad litem (GAL), and the grandparents urged the juvenile court to allow HHS to place A.S. in the care of the grandparents, as they had requested earlier. The child's attorney advocated for A.S. to remain in the fictive kin's care. After the contested hearing, the juvenile court concluded HHS had "unreasonably or irresponsibly failed to discharge its duties in selecting a suitable placement" when it sought to move A.S. to the grandparents two months before the dispositional hearing. The court ordered that

---

[1] The maternal grandparents include the biological grandmother of A.S. and the grandmother's husband. All references to grandparents, grandmother, and grandfather mean the maternal grandparents.

[2] We refer to the married non-relative couple, K.B. and S.B., generally as fictive kin, but on occasion we will reference S.B., who babysat A.S., when discussing her specific actions.

A.S. was to be placed with fictive kin—not adult relatives, who receive preference under the statutory scheme of Iowa Code chapter 232 (2024)—and required that the child not be moved from the fictive kin's home "without reasonable notice to the child's attorney and the [GAL]."

The grandparents filed both an appeal and a petition for writ of certiorari; they argue A.S. should never have been adjudicated CINA because they were appropriate family members ready to take over her care when her parents died. In the alternative—assuming we do not reverse the CINA adjudication—they ask us to reverse the part of the dispositional order placing A.S. with fictive kin rather than relatives and seek reversal of the juvenile court's denial of their motion for concurrent jurisdiction so they can pursue a guardianship under chapter 232D. While filing neither an appeal nor a petition for writ of certiorari, the State—representing HHS—takes a position contrary to the juvenile court's ruling. The child's attorney responds in support of the juvenile court ruling and asks us to disregard the State's appellate filings.[3]

**I. Background Facts and Proceedings.**

The father died of a drug overdose in late May 2024, about a day after HHS first received an allegation that he was using fentanyl and benzodiazepines while living in the family home. A little more than a week after that, A.S.'s mother also died from a drug overdose.

---

[3] Before transferring the case to us, our supreme court ordered the petition for writ of certiorari to be submitted with the appeal and the issue of whether to disregard the State's filing to be submitted with the appeal.

The mother asked the fictive kin to care for A.S. for a few days after the father's death.[4] S.B. called the local police for a welfare check on the mother on June 4 after the mother failed to pick up A.S. and could not be reached. While completing the welfare check at approximately 8:00 p.m., the police found the mother deceased in the family home. The police then contacted the grandmother, who said she would pick A.S. up from the fictive kin's home.

In the immediate aftermath of learning of her daughter's death, the grandmother chose to go to the mother's apartment first and was unable to pick up A.S. as it was near midnight when she finished gathering items. Once it was clear how late the pickup would take place, S.B. and the grandmother planned to do the pickup the next day. S.B. reported that she would contact the grandmother once she heard from HHS the next day, but when S.B. spoke with HHS at approximately 4:00 p.m. on July 5, she told the department the grandmother had not yet come to pick up the child.

With this backdrop of poor communication, HHS sought a temporary removal order in the juvenile court believing the grandmother was a no-show. On top of that, HHS's application also minimized the relationship A.S. had with the grandparents by indicating that fictive kin "said that to their knowledge, [A.S.] has seen [the grandmother] at two of her birthday parties. They are not aware of any other contact."[5] The juvenile court granted the temporary removal, stating, "Parents are both deceased. No immediately available relative to provide care."

---

[4] S.B. had previously provided childcare for A.S., and A.S. maintained close relationships with S.B., K.B., and their three daughters.

[5] At the contested disposition hearing, S.B. denied telling HHS that she was unaware of any other contact between A.S. and the grandparents; she knew that

When she did not hear from S.B. on June 5, the grandmother and other maternal relatives drove to the fictive kin's home at approximately 5:30 p.m. Shortly after arriving the grandmother learned that she would not be allowed to take A.S. given the temporary removal order. The grandmother became very emotional and tried to retrieve A.S. from the van. According to reports, the grandmother was upset, shouting, and demanding to take A.S. The police were called when—according to S.B.—the grandmother physically tried to remove the child and made statements to A.S., including that the child would never see the fictive kin family again.

On June 7, the child's dual attorney and GAL, the county attorney, and the HHS social worker applied to waive the removal hearing. The grandparents—who were not yet parties and had not yet sought to intervene—were unaware and did not weigh in. The juvenile court granted the application and cancelled the removal hearing.

Then another emotionally charged event occurred in late June when the grandmother next saw A.S. The fictive kin offered to take the child to a celebration of life for the mother. Again, there were communication issues related to who could attend, which resulted in the grandmother initially becoming emotional and yelling. After calming down, A.S. reported that the grandmother took her to the restroom and told her that A.S.'s brother[6] was mad at the child for not living with the grandmother and that was why he did not attend. After this event, in-person

---

A.S. had spent time with the grandparents. S.B. testified she only told the HHS worker how little she, personally, had seen or interacted with the grandmother— two times, at A.S.'s birthday parties.

[6] The brother was born in 2010 and lives with his father in a different community.

contact with the grandmother was suspended but phone and Facetime contact was approved. Even so, the grandparents did not take advantage of any calls in June, July, or August. Due to the earlier emotional events, the child's therapist recommended that trust be rebuilt between the child and grandmother.

After the State initiated CINA proceedings, the stepdaughter of A.S.'s maternal grandmother (the step-aunt) sought to intervene and asked to be considered as a placement option for A.S. The child's dual attorney and GAL resisted the step-aunt's motion to intervene, indicating that the step-aunt was not a biological relative and had admitted she had a very limited relationship with A.S. having seen her at just a few family gatherings.

At a hearing on July 8,[7] the court considered the motion to intervene; it ultimately denied the motion "for the reasons stated in [the GAL's] resistance." At the same hearing, the child's dual role attorney stipulated to the adjudication of A.S. as CINA. The court "reviewed the facts and circumstances of the case and [found] there [was] a factual basis for the adjudication." Pursuant to the court's order, "[c]are, custody, and control" of A.S. remained with HHS "[f]or family foster care placement, suitable person, suitable other or fictive kin placement." A.S. remained in the care of the fictive kin.

In HHS's September report to the court, the social work case manager reported that A.S. "verbalized a desire to continue to live with [the fictive kin]." A.S. stated that she loved the grandmother but did not want to live with her; she only wanted to visit her. The case manager noted there were reports A.S. was used to

---

[7] We do not have the transcript of this hearing.

seeing the grandmother weekly, but the child told the worker that she usually saw the grandmother on holidays and had spent the night at her house. In the report, HHS committed to "aggressively explor[ing] placement options for [A.S.] and present[ing] the court an updated placement recommendation with transition plan, if appropriate."

The child's dual role attorney asked the court to continue the upcoming dispositional hearing for about two months so A.S. could begin supervised phone calls with her grandmother, a clear plan could be established to re-introduce A.S. and the step-aunt, and attachment/bond assessments could be completed with each of the interested placement options: the fictive kin, the grandparents, and the step-aunt and her significant other. The court granted the motion, moving the disposition hearing from September 10 to November 5.

On September 10, the court heard the request of the child's attorney and GAL for court-ordered service funds to pay for the bond assessment. In its order granting the request, the court stated:

> [A.S.] recently lost both of her parents due to drug-related deaths. Following the death of her mother, [HHS] attempted to place the young child with the child's maternal grandmother. Some disputed incidences occurred and ultimately a removal was ordered and the child was placed with [HHS] with suitable person placement.
>
> The request for the assessment comes from [the GAL]. The reason for the request is that it appears to [the GAL] and to the Court that there will be significant litigation in the future concerning the ultimate placement of the minor child. Currently, the minor child is residing with suitable placements. She resides in the suitable placement with three other young girls. They all appear to get along well. The child is attending school and is involved in extracurricular activities. She has attended a grief camp during the summer where she wrote a song concerning her love of her deceased parents. The minor child is in therapy where the therapist is working on her grief and other issues.

[HHS] has been talking with the maternal grandmother and another aunt who are both willing to take custody of the child. [HHS] appears to have potentially made a final decision concerning placement of the child. [HHS] appears to want to place the child with a relative. No one is sure at this point about where the law would say as to final placement for this child. [The county attorney] stated that even after over 30 years of juvenile work in Black Hawk County he has never had this scenario occur. The Court also is unsure as to ultimately where the minor child will be placed, whether with relatives or this suitable person placement, through a guardianship, adoption, or other legal rights.

A complicating factor is that the minor child has made [the GAL] and [HHS] aware that she definitely wants to remain in the custody of the suitable placement. She has become quite happy there and desires to remain under their care. Both the maternal grandmother and the aunt want to have placement of the minor child with one of the two relatives. The Court believes this matter is headed toward litigation.

The court ordered the assessments be completed. But, before they were completed, HHS, believing the interactions between the grandparents and A.S. had gone well, decided to change the placement under the requirements of Iowa Code section 232.95(2)(c).[8] HHS planned to move A.S. from the fictive kin's home to the grandparents' home on October 11.

---

[8] Pursuant to section 232.95(2)(c), following a removal hearing, the juvenile court can:

Remove the child from home and place custody of the child with the department *for placement of the child*, pending a final order of disposition, in any of the following categories *in the following order of priority*:

(1) An adult relative of the child including but not limited to adult siblings and parents of siblings.
(2) A fictive kin.
(3) Any other suitable placement identified by the child's relatives.
(4) An individual licensed to provide foster care pursuant to chapter 237. If the child is placed with a licensed foster care provider, the department shall assign decision-making authority to the foster care provider for the purpose of applying the reasonable and prudent parent standard during the child's placement.

(Emphasis added.)

The child's dual role attorney resisted the move. She argued the most recent court orders did not allow a change in placement to the grandparents without court approval; the approved attachment/bond assessments were still ongoing with the various interested adults; and, after speaking with A.S., the child resisted the change in placement. And she noted, "[A.S.] has articulated repeatedly to every person of significance in her life (including [HHS], her therapist, and her grandmother) that she wishes to remain with [the fictive kin]," and she referred to the fictive kin's three children as her sisters. The dual role GAL and attorney asked that any change in placement wait until a full evidentiary hearing was held; she also requested that the court bifurcate the roles of the child's attorney and GAL. *See* Iowa Code § 232.89(4).

The same day—October 8—the juvenile court filed an order enjoining HHS changing A.S.'s placement. It concluded:

> [I]t is not in the child's best interest to move at this stage of the case. The child's therapist authored a report indicating [A.S.'s] need for reassurance and security during this time given all of the loss she has experienced. Her report also indicates that a transition will potentially disrupt her sense of safety and create additional loss. [A.S.] is content in her current placement. It is clear she needs to have minimal transitions to decrease any attachment issues. Further, [the grandparents] and [the step-aunt and her significant other] have court ordered evaluations scheduled in mid-October. Reports from those evaluations will likely have information necessary to make the best long-term placement decision.

The court ordered that the contested issue would be addressed at the dispositional hearing, still set for November 5.

Based on the request of the dual role attorney, the court bifurcated the roles of A.S.'s attorney and GAL, with the already-appointed attorney staying on as the attorney and appointing an additional attorney as GAL.

The grandparents moved to intervene in the CINA case on October 10. The motion was unresisted, and the juvenile court granted it the same day.

On October 29, the newly appointed GAL asked the court for another continuance of the dispositional hearing because the bond-assessment reports were not completed. The court granted the motion, continuing the contested hearing until December 2.

In November, the grandparents asked the juvenile court to correct the adjudicatory order to include the option of placing the child with an adult relative. The grandparents noted the order failed to include adult relatives as a placement option without making a specific finding that placement with an adult relative was not in child's best interests. *See* Iowa Code § 232.96(10)(c). So, the grandparents reasoned, the failure to include the option of placement with an adult relative must have been an oversight—not an intentional omission—which could be corrected with a nunc pro tunc order. Assuming the juvenile court intended adult relatives to be included in the placement options, the grandparents also asked the court to reconsider its order granting the GAL's request to enjoin HHS from moving A.S.'s placement to the grandparents.

The child's attorney resisted. And the court ordered the issues to be considered as part of the upcoming dispositional hearing.

By the time of the December 2 dispositional hearing, the fictive kin; the grandparents; and the step-aunt and her significant other were all working toward becoming licensed adoptive homes.

Leading up to the December 2 dispositional hearing, HHS recommended that permanency (for the purposes of the CINA action) be achieved through a

chapter 232D guardianship rather than adoption, noting A.S. "needs time to grieve the loss of her parents, there is not a need to prematurely move to adoption[,] and, in fact, often times guardianships are established following the death of parents when HHS is not involved." If and when the guardians and A.S. believed it was in A.S.'s best interest to complete an adoption, such an action could be taken in the future. HHS advocated for placement with the grandparents.

Similarly, in her December 1 report to the court, the GAL recommended that A.S. be placed in the home of the grandparents. She asserted this placement would be in A.S.'s best interests.

The child's attorney filed a pre-hearing statement of the child's position, asking the court to "grant her repeated, consistent, and vehement requests to stay in the court-ordered placement of fictive kin." She asked that the court forgo relative placement after finding that it was not in A.S.'s best interests and maintained that the grandmother's actions had shown she "continued to prioritize her own needs and wishes over" A.S.'s. And the child's attorney highlighted concerns with the grandmother being the caregiver, including:

> [The child's therapist] also notes [A.S.'s] dysregulation following visits with [the grandparents] and [the child's] increased insecurity and anxiety about placement. [S.B.'s] records of contact reflect hours [A.S.] spent waiting for her grandmother to arrive for scheduled phone calls and visits. [The grandmother's] chronic tardiness or failure to appear (also noted in the child protective assessment and by [the professional who conducted the attachment/bond assessments]), the lack of hygiene during visits with the [grandparents], the comments (seemingly overheard by [A.S.]) related to physical violence ([the grandmother] "bopping" [the mother] in the mouth when she behaved as [A.S.] was behaving) are a stark juxtaposition to what [A.S.] is experiencing in [the fictive kin's] home.

The grandparents argued A.S. should be placed with them, noting that when both parents of a child are deceased, section 232D.202 requires the court to "give preference to a person, if qualified and suitable, nominated as guardian for a minor by a will that was executed by the parent or parents having legal custody of the minor at the time of the . . . parents' death, and that was admitted to probate under chapter 633." They acknowledged there was no will nominating them as A.S.'s guardians but submitted what they claimed to be a signed letter from the mother—written in July 2023—giving the grandparents "permission . . .to keep [A.S.] if something happened" to the mother and father. Additionally, the grandparents argued the temporary removal order placing A.S. in the care of the fictive kin was based on "untruths," including that A.S. had virtually no relationship with the grandparents and that they failed to pick up A.S. and take her into their care after learning of the death of the mother.

The dispositional hearing took place on December 2; the current HHS case manager, both grandparents, and S.B. testified. On January 9, the juvenile court entered a dispositional order. The court's fact-findings focused on what it determined were negative actions and attributes of the grandmother. Relying on the bond-assessment report, the court suggested that "[i]f the maternal grandmother has not continued to abuse substances, her behaviors may be attributed to her significant grief and trauma history." The court reasoned that:

> Iowa law provides placement priorities when children cannot be placed with their parents. *See* Iowa Code [§§] 232.78, 232.95, 232.102. In this case, unfortunately there are no parents to place the child with. The next best placement option is an adult relative; in this case, [the grandparents]. . . . The Court can decide not to place the child with a relative provided the Court makes a specific finding that "placement with a relative is not in the child's best interest." [*Id.*

§§] 232.78 (c), 232.102(c). The Court shall give deference to [HHS's] decision for placement of a child. [*Id.* §] 232.102(b)(2). A party opposed to [HHS's] placement of a child shall have the burden to prove [HHS] failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for the child. *Id.*

. . . .

[The clinical director and therapist who completed the bond assessments,] recommended that [A.S.]s "security, attachment to, perception and familiarity of the parental figure" should be the primary factors in determining permanency "*rather than solely on biological ties.*" (Emphasis added.) In this case, [A.S.]s best interests are served by continued placement with fictive kin. It is crucial for her long-term growth and wellbeing to remain with the [the fictive kin], where she has established a sense of stability and attachment.

The maternal grandmother is dealing with tremendous grief. Perhaps that grief and her unmet mental health needs are the cause of her behaviors; behaviors that include chronic tardiness and inappropriate comments and behaviors. The Court notes that some of those behaviors appeared to exist prior to the initiation of this case. In any event, her unaddressed grief and mental health needs are not being treated and placing the child with her would be detrimental to [A.S.'s] security and attachment needs based on the reasons set forth in this order and in the assessments completed.

On a practical level, placement with [the grandparents] would be detrimental to the child. [The grandmother] has a history of being chronically tardy. Notably, she failed to arrive to pick up her granddaughter on the day she was notified of her daughter's death, despite being called and informed of the situation. She failed to arrive at a reasonable time the following day. She was chronically late during drop-offs and pickups for visits with [A.S.]. She also missed several Facetime calls with [A.S.]. [The grandfather] had to start doing the exchanges due to [her] tardiness. [The grandfather] testified that he works out of town approximately 10% of the time. . . . [A.S.] has a history of unmet dental health needs and chronic absenteeism from school. The Court has serious concerns that if [she] is placed with [the grandparents], [her] medical, dental and educational needs will suffer. Further, [the grandmother] did not know where [A.S.] would go to school. [The grandmother] testified that she understood [A.S.] needed to continue with her mental health counseling with [her therapist]. The Court believes that it is unlikely that [the grandmother] would be able or willing to ensure [A.S.] continues in therapy, particularly with her current therapist. . . .

[The bond assessments] make it clear that all parties should continue to be a part of [A.S.'s] life. Further, she found that alienation from any party would be detrimental to [A.S.'s] wellbeing. The Court

is concerned that [the grandmother] would alienate [A.S.] from [the fictive kin] based on her prior words and actions. The Court does not have this same concern if [A.S.] continues with [the fictive kin]. [They have] made steps to ensure all family members are involved in [A.S.'s] life. . . .

. . . .

The Court finds that the child has met her burden in proving that [HHS] has unreasonably or irresponsibly failed to discharge its duties in selecting a suitable placement. [HHS] acted unreasonably and irresponsibly when they made the decision on October 2, 2024, to move [A.S.] to her grandparents on October 11, 2024. Several concerns existed at that time that [HHS] completely overlooked including but not limited to [the grandmother's] chronic tardiness, [her] inappropriate comments and behaviors, the lack of contact between the [the grandparents] and [A.S.] from June-September of 2024, [the grandmother's] unmet mental health needs and possible substance abuse issues, [the grandfather's] out of state work travel and [his] very serious criminal and substance abuse history. This child had only had two weekend visits after months of no contact with [the grandparents]. The decision to move [A.S.] was made by the new worker without ever visiting [the grandparents'] home. Instead, the worker relied solely on Facetime calls with [A.S.] during her first visit, which occurred on a weekend when minimal parenting is typically required. They gave no consideration to the fact that the family apparently originally chose [the step-aunt and her significant other] as the placement option. [The grandmother] did not even know the child's birthday in testimony. She was not sure where the child would go to school when she moved. There was apparently no plan for ensuring [A.S.] could continue with her current therapist.

At the time [HHS] decided to move [A.S.] in October, the Court had just ordered evaluations that were not yet completed. The evaluations identified that, given the unique circumstances, [A.S.'s] security, attachment to, perception and familiarity of the parental figure should be the paramount consideration and should not simply be about biological ties. After the evaluations were complete, HHS simply ignored or gave no weight to the assessments and needs of [A.S.]. [HHS] gave little to no weight to the fact that [the grandmother] had serious unresolved mental health needs at a minimum as a result of the tragic death of her daughter and others in her life. [HHS] disregarded [A.S.'s] perception of [K.B. and S.B.] as her mother and father, as well as the additional trauma caused by relocating her to [the grandparents'] home. HHS's rationale for recommending [the grandparents] as the placement option was solely based on their status as relatives, emphasizing that relatives are given priority. [HHS] acted unreasonably and irresponsibly. [It] made a decision without regard to [A.S.'s] best interest, and her

current and future medical, emotional, recreational and educational needs.

The court also noted it was not in A.S.'s best interest to be placed with the step-aunt as she and her husband were "essentially strangers to the child." The court ordered the custody of A.S. to remain with HHS for placement with fictive kin—not an adult relative. It reduced A.S.'s visits with the grandparents, ordering that she "spend a minimum of two uninterrupted weekends per month with her current placement." And the court ordered that A.S. "shall not be moved from her current placement without reasonable notice to the child's attorney and the [GAL]."

One week later, the grandparents asked the juvenile court to authorize concurrent jurisdiction so they could petition to establish a guardianship for A.S. *See* Iowa Code §§ 232.3(2); 232D.301. The child's attorney resisted, arguing A.S.'s preference to remain with the fictive kin should be respected and that both a CINA guardianship and chapter 232D guardianship were options available to the juvenile court following a permanency hearing, so concurrent jurisdiction was unnecessary. *See id.* § 232.104(2)(d)(2), (9)(b). The court set the issue for hearing.

Then, on January 22, the grandparents filed an extensive motion to amend, enlarge, and reconsider. They questioned the court's focus on negative background information related to them but not the negative information regarding the fictive kin. And the grandparents challenged the juvenile court's conclusion that HHS decided to place A.S. with the grandparents in October 2024 based solely on their status as relatives and without proper consideration. They also suggested that the court should question S.B.'s credibility because she had

repeatedly told various maternal relatives of A.S., "Please don't take [A.S.]" And they argued that too much weight was being placed on A.S.'s wishes, as she was not yet sufficiently mature to know what is in her best interests.

The court issued a single, combined order on the grandparents' motions to enlarge and for concurrent jurisdiction. It denied the motion for concurrent jurisdiction, concluding that a separate action for guardianship was not in A.S.'s best interests. The court granted the motion to enlarge and amend in part, correcting the grandmother's name and a few different dates. It denied the motion in all other respects.

The grandparents filed both a notice of appeal and a petition for writ of certiorari. Before transferring the case to us, our supreme court ordered the petition for writ of certiorari to be submitted with the appeal. Then, after the State filed responses that were adverse to the juvenile court's rulings and the child's attorney asked for the responses and position of the State not to be considered, our supreme court also ordered that issue to be submitted with the appeal.

## II. Discussion.

### A. State's Responses.

Though not filing a notice of appeal or petition for writ of certiorari, the State filed responses on appeal that are adverse to the juvenile court's ruling. The child's attorney asks us to disregard them.

As an initial matter, obviously the State is not the GAL and, as it concedes, its position is not in lockstep with that of the grandparents. Thus, *In re G.Y.*, cited by the State, does not apply. 486 N.W.2d 288, 290 (Iowa 1992) ("When a guardian

ad litem takes a position identical with one of the other litigants, the filing of a simple, typewritten document acknowledging that fact will be sufficient . . . .").

Having considered the motion from the child's attorney and the State's response to the motion to disregard, we agree with the child's attorney—"[t]he State, representing [HHS], . . . takes the position the court's ruling is in error, but the State failed to file a notice of appeal. As an appellee, [the State] cannot challenge the adverse ruling on [the grandparents'] appeal; so we consider neither [the State's] position nor its written response." *In re J.L.*, 973 N.W.2d 895, 899 n.1 (Iowa Ct. App. 2022); *see also Brutsche v. Inc. Town of Coon Rapids*, 264 N.W. 696, 699 (1936) ("It seems to be the settled rule in this state that one party cannot avail himself of an appeal prosecuted by the other party to ask a review of that portion of the judgment adverse to himself."); *Becker v. Cent. States Health and Life Co.*, 431 N.W.2d 354, 356 (Iowa 1988) ("Failure to [appeal or] cross-appeal on an issue decided adversely to an appellee . . . forecloses the [party] from raising the issue on appeal."), *overruled on other grounds by Johnston Equip. Corp. v. Indus. Indem.*, 489 N.W.2d 13, 16 (Iowa 1992); *cf. State v. Hagen*, 840 N.W.2d 140, 144 n.3 (Iowa 2013) (concluding the appellee did not preserve an issue for appeal because he "did not file an appeal or cross-appeal on the issue").

**B. Form of Intervenor-Grandparents' Challenge.**

Here, the grandparents challenge the juvenile court's dispositional order selecting "fictive kin" as the placement category pursuant to Iowa Code section 232.102(1)(a)(2) and its denial of their motion for concurrent jurisdiction—both were addressed in the juvenile court's "order on motion for concurrent jurisdiction and motion to enlarge and amend" filed February 28, 2025.

Iowa Code section 232.133(1) states in part, "An interested party aggrieved by an order or decree of the juvenile court may appeal from the court for review of questions of law or fact." "The statute provides no special basis for an appeal as a matter of right. As with all other orders, appealability depends on whether a juvenile court order is found to be 'final.'" *In re W.D.*, 562 N.W.2d 183, 185 (Iowa 1997). "[A]n appealable order in a juvenile case is one that disposes of all issues, including disposition." *In re Long*, 313 N.W.2d 473, 476 (Iowa 1981). And here, the juvenile court included the denial of the request to pursue concurrent jurisdiction in the same order.

The order was final and appealable. *In re J.C.*, No. 19-0240, 2019 WL 2374430, at *1 (Iowa Ct. App. June 5, 2019) (concluding order waiving the department's obligation to make reasonable efforts was contained in a dispositional order, which was final and appealable); *In re A.C.*, No. 24-0435, 2024 WL 2842230, at *4 (Iowa Ct. App. June 5, 2024) (considering partial grant of concurrent jurisdiction on appeal of dispositional order). And because we can properly consider the grandparents' challenges to the request for concurrent jurisdiction, the dispositional ruling, and the CINA adjudication, a grant of writ of certiorari is not necessary here. *Cf. State v. Rutherford*, 997 N.W.2d 142, 149 (Iowa 2023) (McDermott, J., concurring specially) ("Review through a grant of certiorari is unnecessary in this case because, as the majority correctly concludes, we have appellate jurisdiction over the entire case . . . .").

**C. Removal & CINA Adjudication.**

The grandparents challenge the initial removal order and the adjudication of A.S. as a CINA. They claim that because they were always available and

suitable to care for A.S., the juvenile court was wrong to grant the application for removal and the CINA petition.

We understand the grandparents' frustration. An initial communication issue prevented them from assuming immediate care of A.S. And then, once the juvenile court became involved, professionals unknown to the family waived hearings and made stipulations impacting A.S.'s future without the family's input or participation. But any issues with the removal order are now moot. *In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994). While we can consider the grandparents' argument that there is no need for the juvenile court's involvement going forward, "[w]e cannot go back in time and restore custody based on alleged errors in the initial removal order." *Id*

This is the proper time in the proceedings to challenge the juvenile court's adjudication decision. *See In re H.W.*, 961 N.W.2d 138, 140 n.1 (Iowa Ct. App. 2021) (recognizing a parent properly appealed the adjudication of her children as CINA following entry of the subsequent dispositional order). However, while we recognize the grandparents were not yet parties at the time, the juvenile court adjudicated A.S. in need of assistance based on a stipulation—the issue was not contested. We assume that means the argument the grandparents raise on appeal, that they were available and ready to take over A.S.'s care so adjudication was unnecessary, was not made to the juvenile court. *See In re M.A.F.*, 679 N.W.2d 683, 685 (Iowa Ct. App. 2004) ("[A]n issue which is not raised before the juvenile court may not be raised for the first time on appeal."). We must assume because we have no record from the hearing at which this stipulation occurred; we are unable to review what evidence and arguments the juvenile court had before

it at the time it adjudicated A.S. in need of assistance. We cannot review the CINA adjudication in this case.

**D. Dispositional Order.**

The grandparents challenge the portion of the dispositional order that requires HHS to place A.S. with fictive kin rather than adult relatives.[9] While it is undisputed the juvenile court has the authority to determine the category of placement, *see* Iowa Code § 232.102(1)(a), (b)(1), the grandparents challenge the district court's conclusion that—contrary to the assertion of HHS and the GAL—they are unsuitable to care for A.S. and that placing A.S. with an adult relative is not in her best interests.

Iowa Code section 232.102(1) controls. It provides:

> 1. a. . . . If [after a dispositional hearing] the court finds that custody with either of the child's parents is not in the child's best interests, the child's custody shall be transferred to the department for placement of the child in any of the following categories in the following order of priority:
> (1) An adult relative of the child including but not limited to adult siblings and parents of siblings.
> (2) A fictive kin.
> (3) Any other suitable placement identified by the child's relatives.
> . . . .
> b. (1) If the court places custody of the child with the department pursuant to paragraph "a", the court may identify a category listed in paragraph "a" for placement of the child, but the department shall have the authority to select the specific person or

---

[9] To be clear, in the dispositional order, the juvenile court ordered that placement was to be within the fictive-kin category—it did not order A.S. to be placed with S.B. and K.B. specifically. *See Iowa Dep't of Health and Human Servs. v. Iowa Dist. Ct.*, No. 24-0834, 2025 WL 548012, at *4 (Iowa Ct. App. Feb. 19, 2025) (recognizing that when HHS is the child's custodian, chapter 232 gives the juvenile court the power to identify a category of placement—like adult relatives or fictive kin—while the department has the authority to select the specific person within that category for placement).

facility within that category for placement, subject to court review at the request of an interested party.

(2) The court shall give deference to the department's decision for placement of a child. A party opposed to the department's placement of a child shall have the burden to prove the department failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for the child.

c. A court shall not order placement of a child in a category identified in paragraph "a", subparagraph (2), (3), (4), or (5) without a specific finding that placement with an adult relative is not in the child's best interests and providing reasons for the court's finding.

Iowa Code § 232.102(1). Here, return of custody to A.S.'s parents was impossible, so—as required—HHS was given custody of the child for placement. *See* Iowa Code § 232.102(1)(a). The juvenile court was then to identify the category of placement, *see id.* § 232.102(1)(a)(1)–(5), with adult relatives receiving the highest priority, *see id.* § 232.102(1)(a). And here, where the court did not select the category of "adult relatives" of A.S., the court was required to make "a specific finding that placement with an adult relative is not in the child's best interests and provid[e] reasons for the court's finding." *Id.* § 232.102(1)(c).

While the juvenile court did not explicitly rule that placement with the grandparents is not in A.S.'s best interests,[10] we think that conclusion is obvious from and implied by the rulings the court did make.[11] With that, we review the evidence presented to the juvenile court and its ruling.

_____

[10] While slightly different, the court did rule that A.S.'s continued placement with fictive kin is in her best interests. And it explicitly ruled that placement with the step-aunt was not in A.S.'s best interests. Plus, based on the court's fact-findings as to the maternal grandparents, it is clear the court concluded it is not in A.S.'s best interests to be placed with them.

[11] The juvenile court spent much of the dispositional order concluding HHS acted unreasonably or irresponsibly in discharging its duties by recommending the maternal grandparents as placement for A.S. *Cf.* Iowa Code § 232.102(1)(b)(2). It is not clear why the juvenile court undertook this analysis, as it was not necessary

Returning to the dispositional hearing, evidence was presented to address which placement option would best meet the best interest of A.S. Here, we agree with our sister panel, that the best-interest framework in section 232.116(2) guides a juvenile court's best-interest analysis.[12] *See L.P.*, 2025 WL 2237316 at *8–9.

---

or appropriate for the decision the court was being asked to make. Section 232.102(1)(b)(2) only comes into play when—*after* the juvenile court selects the category of placement—HHS selects a specific placement option that a party opposes. Then, the party opposing HHS's placement option has "the burden to prove the department failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for the child." Iowa Code § 232.102(1)(b)(2). At the time of the dispositional hearing, the court was being asked to select a category of placement anew—the court was not reviewing a previous HHS placement decision. And the court did not have to find a reason to go against HHS's recommendation that A.S. be placed with the maternal grandparents going forward—it is up to the court to select the category of placement, and then HHS selects a specific placement option within that category. *See id.* § 232.102(1)(a), (b).

While this analysis was inapt, it was not an error that impacted the court's overall ruling. So in our review of the court's decision, we disregard the unnecessary finding under section 232.102(1)(b)(2). *See In re L.P.*, No. 25-0044, 2025 WL 2237316, at *10 (Iowa Ct. App. Aug. 6, 2025) (disregarding the finding that the department acted unreasonably and irresponsibly when affirming the dispositional order, as the juvenile court's "unreasonably and irresponsibly" ruling was unnecessary in deciding to direct placement within the category of fictive kin).

[12] Iowa Code section 232.116(2) provides:

In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child. This consideration may include any of the following:

a. Whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition or the parent's imprisonment for a felony.

b. For a child who has been placed in foster family care by a court or has been voluntarily placed in foster family care by a parent or by another person, whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family. In considering integration into a foster family, the court shall review the following:

The juvenile court detailed its reasons for placing A.S. with the fictive kin. First, we note that the child's preference since her parents' deaths has consistently been to stay with the fictive kin and their children, who she called her "sisters." While not controlling, a minor child's preference is relevant. *In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019) ("Preferences of minor children while not controlling are relevant and cannot be ignored." (citation omitted)). When considering a child's preference, there is a "host of factors" to consider, including:

> (1) their age and education level; (2) the strength of their preference; (3) their intellectual and emotional make-up; (4) their relationship with family members; (5) the reason for their decision; (6) the advisability of honoring the child[]'s desire; and (7) the court's recognition it is not aware of all the factors influencing the children's view.

*Id.* Within chapter 232 cases, the legislature has placed an emphasis on the wishes of children "over ten years of age," and A.S. was only eight. *Cf.* Iowa Code § 232.116(3)(b) (allowing the court to not terminate a parent's rights when "[t]he child is *over ten years of age* and objects"). Even so, the child's attorney detailed the child's reasons for the preference, which showed her maturity, and we are not prohibited from considering her wishes.

---

(1) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining that environment and continuity for the child.
(2) The reasonable preference of the child, if the court determines that the child has sufficient capacity to express a reasonable preference.
c. The relevant testimony or written statement that a foster parent, relative, or other individual with whom the child has been placed for preadoptive care or other care has a right to provide to the court.

On top of the child's strong preference, the juvenile court noted the longstanding close relationship that had developed between the fictive kin, their children, and A.S. That relationship began early in A.S.'s life and had continued to be a stable factor because the fictive kin served as a back-up caregiver for the parents. Photographs over time and the fictive kin's history of contact established that relationship was significant and close. Contrast that evidence with the grandparents who also offered photographs, but as the court noted, A.S. was much younger in those exhibits.

Next, we cannot ignore the juvenile court's specific findings related to the credibility of the grandparents. *See In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014) (noting that we give weight to the juvenile court's factual findings, but they do not bind us). From the photographs produced and testimony, the court could not find the grandparents' claim that they spent significant time with A.S. to be credible. And, the court noted that the grandmother did not know the birthday of A.S. The court also noted that the grandmother's chronic tardiness when maintaining contact with A.S. and the professionals in the case was concerning.[13] Because the grandmother denied that behavior, despite the testimony of the grandfather and the fictive kin to the contrary, the court specifically found her to be "untruthful." The court also found that the fictive kin were more likely to encourage contact with A.S.'s family going forward and expressed concern that the grandmother was more likely to alienate the child from fictive kin. A.S.'s therapist opined that continuing

---

[13] Evidence showed that on several occasions, the grandmother was significantly late to pick up, deliver, or make phone calls with the child. The grandfather was tasked with arranging travel given these concerns.

contact with both the relatives and the fictive kin would be important for the child's welfare.

The court picked up on other aspects related to the grandmother that weighed against a best interest finding in her favor. While the confusion at the time of her daughter's death related to the pickup of A.S. certainly was emotional, the grandmother's statements and aggressiveness in front of the child when she went to retrieve her, coupled with the statement to A.S. at the celebration of life ceremony, created conditions where in-person contact between the grandmother and child had to be suspended. The grandparents did not engage in telephone visits during the months of June, July, and September when those were offered instead. It was not until the step-aunt attempted to intervene and it was denied that the grandmother engaged with A.S. again. In the bonding assessment of the grandmother, the evaluator noted that the grandmother "unintentionally projects her feelings, need and grief on to A.S." The evaluator opined that the child is in need of an emotionally and physically present and regulated caregiver. Finally, the evaluator recommended that permanency for A.S. should be focused on "her security, attachment to, perception and familiarity of the parental figure, rather than on biological ties."

There were also concerns about the grandparents' history, albeit old, of substance use. Although the grandfather claimed sobriety, he reported thirteen to fifteen operating-while-intoxicated convictions, with a relapse in 2019, for which he never sought any formal treatment. The grandmother had two operating-while-intoxicated charges and used pain medications for the "wrong reasons" in 2005. All of which was noted as a concern to the court, but even more, the bond

assessment evaluator noted possible indicators of substance use when the grandmother presented. However, there is no solid proof of any usage. So, we do not consider these factors.

Continuing with the best-interest analysis, evidence suggested that the biological parents had not maintained good dental health for A.S. and her school attendance at a different school every year had been poor. The court took into account the stability that the fictive kin offered from the onset of the placement. The fictive kin involved A.S. with a grief camp, mental-health counseling, Girl Scouts, softball, gymnastics, and signed her up for school, where she was thriving. It was noteworthy that at the dispositional hearing, the grandmother had not thought through where the child would attend school if placed with her. While continued placement with the fictive kin would not disrupt the school and many activities that A.S. enjoyed.

Finally in the bonding assessment conducted on the step-aunt's partner, he recognized that the "grandparents are getting older and don't want to do the mom and dad things, they want to be grandparents." The court took notice of this comment and had the benefit of A.S.'s therapist's assessment of the child's status and needs. In a November report, the therapist opined that:

> [A.S.] presented with increasing dysregulation in sessions starting 9/23/24 and this continued to be present in sessions on 9/30/24, 10/07/24, and 10/28/24. This is around the same time weekend visits began with [the grandparents]. It is not clear as to what has [led] to the increase in dysregulation, it is possible [A.S.] is struggling with the transitions between the homes. [A.S.] also seems to be increasingly aware of the uncertainty of her placement and thus feeling more insecure and anxious. On 10/07 and 10/28/24, [A.S.] verbalized to this counselor without any probing she wanted to live with [the fictive kin]. . . .

It is important to consider attachment needs and the impact of [A.S.] losing both parents when considering placement. [A.S.] needs a clear sense of "home" and consistency with primary caregivers. It's not healthy for multiple people to be actively involved in caregiving as this can interfere with the ability to attach to the primary caregivers. This can be confusing for [A.S.] as to who [are] the primary caregivers and interfere with a sense of permanency. In response to the idea that [A.S.] may stay with [the grandparents] temporarily and then transition to [step-aunt's] home this counselor expressed grave concerns.

The counselor opined that transitioning to multiple homes could have a negative, long-lasting impact on A.S. and her future relationships, compounding her feelings of grief and loss.

The court engaged in a full and comprehensive analysis of the best interests of A.S. in deciding what category of placement to select and, on our de novo review, we affirm the juvenile court's dispositional ruling.

**E. Motion for Concurrent Jurisdiction.**

Finally, we turn to the concurrent jurisdiction question because if we transfer the case to a guardianship, the juvenile court will proceed under chapter 232D going forward. At the onset, the current placement would not be impacted, however, as we recognize that granting concurrent jurisdiction would not allow the court "to enter orders that conflict with or frustrate the placement that the juvenile court has temporarily established for purposes of a pending CINA proceeding" until such time as the CINA status "has been rendered of no further effect by orders of the juvenile court." *A.B. v. M.B.*, 569 N.W.2d 103, 105 (Iowa 1997). But, as all participants in the proceedings have recognized, this case does not fit squarely into the framework of a CINA case, thus, we ask would the guardianship path be the best course. We think not.

The juvenile court has exclusive jurisdiction over all matters involving the custody, guardianship, and placement of a child who is subject to CINA proceedings. Iowa Code § 232.3(1). But "[t]he juvenile court has the legal discretion to authorize a party to litigate concurrently a specific issue relating to custody, guardianship, or placement of a child who is the subject of a pending juvenile action." *In re R.G.*, 450 N.W.2d 823, 825 (Iowa 1990). The court must exercise this discretion in the best interests of the child. *Id.*

The grandparents asked the juvenile court to authorize concurrent jurisdiction so they could "proceed with the permanent custody" and seek a guardianship in district court. *See* Iowa Code § 232.3(2). The child's attorney resisted, noting that the impact would be to prolong the efforts against the child's expressed interests; the GAL took no position on the concurrent jurisdiction issue. The juvenile court denied the grandparents' request, ruling "that a separate action for guardianship at this stage is not in the best interest of [A.S.]" The grandparents challenge this decision; they argue that A.S.'s future caretakers can be determined without ongoing State intervention as there are no ongoing safety concerns and chapter 232 CINA proceedings are not the right theater for a custody battle.

But, we take into account that the child's therapist addressed the emotional roller coaster that the child has been on and the emotional toll involved. Often a guardianship is not considered in the best interests of a child who is younger because no one wants to place a child in limbo and, here, the child's counselor advocated for a permanent home to give the child a sense of security. We agree with that goal.

In viewing the decision to pursue concurrent jurisdiction in the best-interests lens, we find that the most efficient resolution for the child would be to continue the course through chapter 232 proceedings that require HHS to develop a case permanency plan. Additionally, as ordered by the juvenile court, the child should continue counseling with her therapist and be allowed access to reasonable efforts under section 232.102A(3) for services to place the child for adoption. On top of that, given the therapist's opinions about A.S.'s need for stability and the emotional toll that has impacted the child, this case should move forward to permanency under the time standards established under chapter 232. We agree with the juvenile court's denial of concurrent jurisdiction.

**III. Conclusion.**

Having considered the intervenor-grandparent arguments, we affirm the rulings of the juvenile court.

**AFFIRMED.**